UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
(SOUTHERN DIVISION)

---

| | |
|---|---|
| ALBERT YATES and ANN YATES, | Case No. 1:21-cv-00962-HYJ-PJG |
| Plaintiffs, | Hon. Hala Y. Jarbou |
| v | |
| KYLE MILLER LLC, d/b/a RIDGEWOOD BUILDERS; and KYLE MILLER, an individual, | |
| Defendants. | |

| | |
|---|---|
| Andrew J. Broder P23051 | Amanda B. Fopma P72459 |
| **Payne, Broder & Fossee, P.C.** | Christopher K. Cooke P35034 |
| **Attorneys for Plaintiffs** | **Secrest Wardle** |
| 32100 Telegraph Road, Suite 200 | **Attorneys for Defendants** |
| Bingham Farms, MI 48025 | 2025 E. Beltline Ave., S.E., Suite 600 |
| 248-642-7733 | Grand Rapids, MI 49546 |
| abroder@ppbf.com | 616-285-0143 |
| KNarring@ppbf.com – Sec. | afopma@secrestwardle.com |
| | ccooke@secrestwardle.com |
| | rensign@secrestwardle.com – Sec. |

### DEFENDANTS RIDGEWOOD BUILDERS AND KYLE MILLER'S MOTION IN LIMINE TO BAR CERTAIN TESTIMONY OFFERED BY PLAINTIFFS' EXPERT WITNESS TREVOR WEILAND PURSUANT TO FRE 702

NOW COME the Defendants, Kyle Miller, individually and Kyle Miller LLC, d/b/a Ridgewood Builders, by and through their attorneys of record, SECREST WARDLE, and hereby move this Court pursuant to FRE 702 to exclude or strike all or certain portions of the testimony of Plaintiffs' expert, Trevor Weiland, as speculation and/or not based on reliable facts or data as required by the rule.

**RELEVANT FACTS**

In late November of 2019, Plaintiffs Albert and Ann Yates hired Kyle Miller, LLC d/b/a Ridgewood Builders ("Ridgewood") to do substantial demolition and rebuilding work on a home they purchased at 6197 Crystal Drive on Crystal Lake in Beulah, Michigan. Many unforeseeable problems were encountered along the way due to the condition of the home when it was purchased by the Plaintiffs, particularly with the foundation of the home. In August of 2021, the Plaintiffs terminated Ridgewood Builders when longstanding deterioration of the foundation was discovered after demolition work on the subfloors had begun.

After Ridgewood Builders was terminated from the project by the Plaintiffs, they retained the services of structural engineer, Trevor Weiland, to review the partially rebuilt structure and render certain opinions regarding the work done on the structure by the Defendant. Mr. Weiland issued two reports. The first one, dated September 24, 2021, did not include photos. When Mr. Yates received the first report, he contacted Mr. Weiland and asked him to supplement the report with his photos. Mr. Weiland then issued a second report, dated January 24, 2022, which is essentially identical to the first report although with photos attached. (**Exhibit 1**, report dated 9/24/21, and **Exhibit 2**, report dated January 24, 2022). The Plaintiffs demolished the home in late December of 2021 after they filed their lawsuit in this Court. No notice of the demolition was provided to Defendant or his attorney.

Mr. Weiland was deposed on September 14, 2022. Mr. Wieland is a licensed professional engineer employed by his own company, Wieland Structural Engineering in Williamsburg, Michigan. Mr. Wieland obtained a Bachelor's degree in Civil Engineering from Lawrence Institute of Technology in 2003. Mr. Weiland obtained his license in 2008. His review of the residential construction at the Yates residence was the first time he was ever asked to review the structural

2

engineering components of a partially rebuilt residential home. (**Exhibit 3**, deposition of Trevor Weiland at p. 14, 15). Mr. Wieland testified that he was contacted by Mrs. Yates and toured the home on September 16, 2021. Mr. Wieland toured the home for two hours and took photos with his cell phone. (**Exhibit 3**, p. 23, 26). He believes he took measurements but did not bring those notes to his deposition. However, he did no calculations. (**Exhibit 3** at p. 39, 45, 47, 52, 55, 60, 62, 83, 85, 92, 95). Mr. Weiland did not distinguish between existing structure and new work in his analysis (**Exhibit 3** at p. 24).

Mr. Weiland did not know if Ridgewood Builders had completed its work or if the company had been terminated before finishing the job. (**Exhibit 3** at p. 32). Mr. Weiland is not a contractor. He did not conduct any investigation as to the cost of repairing the foundation. Foundations can be repaired and it is not uncommon. A cost analysis could have been done, however. Mr. Weiland did not measure the depth of the foundation. He may have simply "eye-balled it." He testified: "My intent was not to be precise with this." (**Exhibit 3** at p. 59). He did no soil load bearing calculations to determine the load bearing capacity of the soil and, thus, the required depth of the foundation. (**Exhibit 3** at p. 60). Yet, Mr. Weiland opined that the "existing foundation does not distribute load to the soil." He conceded that this was "pure opinion" without supportive facts. (**Exhibit 3** at p. 60, 61). Mr. Weiland did not know what it would cost to demolish the home and rebuild. (**Exhibit 3** at pps. 33, 34, 36).

Mr. Weiland testified that it was his "professional opinion" that the price tag associated with repairing the foundation would be more expensive than tearing the house down and replacing the foundation (**Exhibit 3** at p. 33). However, he conceded that this opinion was pure speculation. Mr. Weiland testified:

Q: Well, how can you say that if you don't know what it would cost?

3

> **A:** **Well, I'm not looking at it in terms of – you know, take away the dollar amount and just the invasive nature of shoring an existing home and pouring a new foundation I know for certain would cost more than demolishing it and a new foundation. And again, that's just my opinion, but I can't imagine that it would be any other way. But you can disagree with that, that's fine. You know, I don't have a foundation, pun intended, to stand on to support my claim, but somebody could do that cost analysis, I'm sure pretty quickly, if that was required.**
>
> Q: I'm entitled to understand the basis for your opinion on that and it seems to me that you're speculating about that. You don't really have an idea what it would cost.
>
> **A:** **Yeah, you can say that I'm speculating, sure. That's fine.**

(**Exhibit 3** at p. 37).

Mr. Weiland did not calculate any design loads on the structure, yet he testified that moving up the collar ties on the roof rafters "possibly" overstressed the rafters. (**Exhibit 3** at p. 53, 54). However, he does not know for certain if it did (**Exhibit 3** at p. 54). Mr. Weiland also takes issue with the load path to the garage caused by the new framing. However, he also conceded that it is "obviously just a guess" (**Exhibit 3** at p. 94). Here is how he described the basis of his opinions regarding the garage foundation and framing:

> **A:** **You know, I add words like likely and probably and assumed and things like that as caveats because I don't know for sure. I can't put my eyeballs on certain things. I'm making an assumption, so it's my assumption that the garage foundation is similar to that of the home. The garage may be – and I'd have to go take a look at the photos of the garage, but the garage may be just on a slab on grade. I'm not certain. But it's likely it's a similar foundation. It's not absolute, it's likely.**
>
> Q: Were they built at the same time, the garage and the house?
>
> **A:** **I don't know that for sure.**
>
> Q: So you don't know if the methods of construction were the same with respect to the house and the garage?
>
> **A:** **No, I don't. That's why I said likely.**

4

> Q: Well, you're guessing, right?
>
> **A: Educated guess, yeah, I guess. I'm adding as many caveats as I can. I don't know. I can't put eyes on it, I'm just giving my opinion.**

(**Exhibit 3** at p. 65.)

Mr. Weiland continued to advance his "opinion" that it was more cost effective to tear the structure down and rebuild than to repair the existing foundation. However, he testified:

> Q: The question is, sir, and I think we've made it clear, you personally did nothing to determine the cost of replacing the foundation on this house, right?
>
> **A: Yeah, and I've stated that numerous time[sic] and I said due to the fact that I do not do cost analyses I have stated clearly, I think, that professionals that do cost analyses should maybe be considered to have been obtained to do a cost analysis and there you would have your answer. And it is my opinion that I would be shown to be correct. I'm not looking to say I'm correct and I win this debate. That doesn't matter to me one iota. But a cost analysis would have likely, in my opinion, proven that it would have been more cost effective to tear down and start over versus remediating the existing foundation that was inadequate, to say the least.**
>
> Q: That's what your client did, though, tore the place down, right?
>
> **A: I don't know who tore it down.**

(**Exhibit 3**, p. 68)

## LAW AND ARGUMENT

Testimony of expert witnesses is controlled by Federal Rule of Evidence (FRE) 702, which states:

> **Testimony by expert witnesses.**
>
> A witness who has been qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise, if:
>
> a. The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b. The testimony is based on sufficient facts or data;

5

    c. The testimony is the product of reliable principles or methods; *and*
    d. The expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court tackled the question of the admissibility of expert opinion testimony in the linchpin case of *Daubert v. Merrill Dow Pharmaceuticals Inc., 509 US 579 (1993)*. The Court announced certain guiding principles to be used by presiding judge in determining whether or not to allow expert testimony. The Court provided this direction to the trial judge as "gatekeeper" of the evidence.

> "The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986)."

Further,

> But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

And, further,

> "An additional consideration under *Rule 702*—and another aspect of relevancy— is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."

The Court announced this general test for determining admissibility of an expert's opinion:

> "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to *Rule 104(a),* whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."

The appellate courts have consolidated the holding of *Daubert* in subsequent cases to require:

> Even where a witness is qualified to testify as an expert, he may only testify if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product

6

of reliable principles and methods, and (3) the testimony evidences reasoning or methodology that properly can be applied to the facts. *Simmons v. Ford Motor Co., 132 Fed. Appx. 950 (3d Cir. 2005) citing to F.R.E. 702; In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 742, 40 Fed. R. Evid. Serv. 379, 30 Fed. R. Serv. 3d 644, 25 Envtl. L. Rep. 20989 (3d Cir. 1994).*

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proferred." *General Electric Co. v. Joiner, 522 U. S. 136 (1997).*

In the matter before this Court, Mr. Wieland was retained by the Plaintiffs to review the partially finished rebuild job at their home. Mr. Wieland spent two hours at the home, took photographs, may have taken measurements, but did not do any calculations related to load, stresses, or stability of the soil. He did no cost analysis related to repair of the foundation as compared with tearing the house down and building anew. He freely admits that his opinions are speculative, and he has no "foundation" to express them. Mr. Wieland would like to support the Plaintiffs' argument that it was more cost effective to fire Ridgewood Builders, tear down the partially rebuilt structure, tear up the old foundation, pour a new foundation, and build a new home on the property. However, he collected no reliable facts or data other than his own "opinion" after he "eyeballed" the place.

Further, Mr. Wieland is a structural engineer, not a contractor. He has never demolished a foundation, repaired a foundation, or poured a new foundation. He had no idea at his deposition what the demolition costs would be. He had no idea what type of structure was to be built new on the lot or what it might cost. He simply provides his "ipse dixit" opinion that it was a more economical decision by the Plaintiffs to tear the structure down and build anew. Mr. Wieland, himself, called the opinion "speculation" and an "educated guess." Certainly, this opinion does not qualify as admissible expert opinion under FRE 702.

SECRESTWARDLE

Various of his other opinions, likewise, do not qualify. He opines that the roof rafters are "possibly" overstressed by moving the collar ties higher to the peak. Although he could have done some calculations to support this opinion, he did not. Mr. Wieland claims that the new framing connecting the second floor of the home with the garage may have overstressed the foundation of the garage, and certain new loads on the garage structure were not properly distributed. However, Mr. Wieland did nothing to calculate the loads, the changes in the loads, the depth or type of foundation under the garage, or any basic data collection to support these statements. He just assumed the garage and home were built at the same time and, thus, the garage has the same style foundation as the house. This is all pure speculation.

As the home was torn down by the Plaintiffs several months after Mr. Wieland's inspection and after the lawsuit was filed by the Plaintiffs, there is no way to view the structure, take measurements, calculate loads and stresses, or determine if the foundation is repairable and at what cost, thereby rendering it impossible for the Defendants to directly confront the conclusions of Mr. Wieland. Thus, whether this testimony is admissible before the jury is critical to the fair defense of this case.

Plaintiffs' structural engineering expert, Tom Wieland, did not collect sufficient facts or data to support his opinions. He did not employ reliable methodology in interpreting the data. Mr. Wieland did not apply any principles and methods to the facts of the case to support any of his opinions. Mr. Wieland should not be allowed to offer expert opinions in this matter.

> Respectfully submitted,
> **SECREST WARDLE**
> Attorney for Defendant

Dated: February 6, 2023        By: */s/ Christopher K. Cooke*
                                    Christopher K. Cooke (P35034)

8

Attorneys for Defendants
2025 E. Beltline Ave., S.E., Ste. 600
Grand Rapids, MI 49546
(616) 285-0143

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record and/or non-represented parties herein at their respective addresses as directed on the pleadings on February 6, 2023, by:

☐ US MAIL   ☐ FAX   ☐ HAND DELIVERY   ☐ UPS   ☐ FEDERAL EXPRESS   ☐ OTHER   ☒ E-FILING

*/s/ Chenney L. Ward*
Chenney L. Ward